Filed 6/8/23  P. v. Danielson CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>                     v.<br><br>DAVID DANIELSON,<br><br>    Defendant and Appellant. | A163777<br><br>(Napa County Super.<br>Ct. No. CR24729) |

In January 2019, David Danielson filed a petition under Penal Code section 1170.95[1] (now section 1172.6)[2] in Napa County Superior Court.  He sought resentencing regarding his 1998 conviction for the first degree murder of Dr. Richard Holman, for which he was sentenced to life without the possibility of parole.

The petition alleged that the charges filed against Danielson in the 1998 case allowed the prosecution to proceed under a theory of felony murder or murder under the natural and probable consequences doctrine.  It further alleged that Danielson could not be convicted under current law because he

---

[1] Statutory citations are to the Penal Code unless otherwise indicated.

[2] Effective June 30, 2022, former section 1170.95 was renumbered section 1172.6, with no change in text.  (Stats. 2022, ch. 58, § 10.)

1

was not the actual killer and did not, with the intent to kill, aid, or assist the actual killer in the commission of the first degree murder.

After reviewing Danielson's record of conviction, the trial court summarily denied Danielson's resentencing petition without issuing an order to show cause, ruling that he failed to make a prima facie showing that he could not have been convicted of first degree murder under current law. Danielson now appeals. We conclude that the trial court was correct: Danielson is ineligible for relief under section 1172.6 as a matter of law.

## I. BACKGROUND

In 1995, Danielson (along with his brother Gary[3], and Brian Nielson) was charged with Dr. Holman's murder in an indictment that included robbery and burglary special circumstance allegations under section 190.2, subdivision (a)(17). At the subsequent 1998 trial, two eyewitnesses to Danielson's actions testified—Barbara Holman[4], who was the widow of Dr. Holman, and Nielson, who admitted repeatedly stabbing Dr. Holman. Their testimony and corroborating evidence indicate that eight years before the trial, Danielson worked as a janitor at Dr. Holman's chiropractic office. The parties agree that on the evening of March 30, 1990, Danielson, Gary, and Nielson went to the Holman residence. Dr. Holman and Mrs. Holman were home and allowed them into the residence. While they were there, Dr. Holman was stabbed 47 times and died from his wounds, with at least Nielson repeatedly stabbing him with a knife.

---

[3] For clarity's sake, we refer to David Danielson as Danielson and Gary Danielson as Gary. We mean no disrespect by doing so.

[4] By the time of trial, Barbara Holman's name had become Barbara Holman Foerder. The parties refer to her as "Mrs. Holman." For clarity's sake, we will do the same and mean no disrespect by doing so.

As we will discuss, Mrs. Holman and Nielson gave testimony that is similar regarding many details of what occurred in the Holman residence that night, but which differ somewhat regarding Danielson's and Gary's actions. According to Mrs. Holman, Danielson restrained her as Nielson stabbed Dr. Holman while Gary went about the house putting items in a pillowcase. According to Nielson, Gary restrained Mrs. Holman as Nielson stabbed Dr. Holman while Danielson went about the house putting items in a pillowcase. Mrs. Holman and Nielson both testified that at some point during the incident, Nielson lost some part or all of his knife, called the other two men over, and told them to look for the missing knife. The three looked and the knife was recovered. A short time later, the three left the residence, one of them kicking Mrs. Holman on the way out.

Danielson, Gary, and Nielson were not arrested until some years later, apparently in part because Nielson falsely told Mrs. Holman he was a recently released inmate avenging Dr. Holman's conduct in prison (where the doctor was sent for tax evasion), throwing off the search for Dr. Holman's killers. The three were arrested after Nielson's estranged wife reported his participation in the crime to the police. Nielson subsequently pleaded guilty and testified at the trial under an agreement with the prosecution that the prosecution would not seek the death penalty against him for Dr. Holman's murder if he cooperated fully and testified truthfully.

In closing argument, the prosecutor argued that, assuming the jury did not have sufficient evidence to find Danielson was Dr. Holman's actual killer, Nielson's testimony proved he conspired with Gary and Nielson beforehand to kill Dr. Holman, thereby showing his intent to kill, and assisted in Dr. Holman's murder. Based on this testimony, the prosecutor urged the jury to find Danielson guilty of murder and the burglary and robbery special

3

circumstance allegations brought against him to be true. Regarding these allegations, the jury was instructed pursuant to CALJIC 8.80 in relevant part: "If you find beyond a reasonable doubt that the defendant was either the actual killer or a co-conspirator or an aider and abettor, but you are unable to decide which, then you must also find beyond a reasonable doubt that the defendant with intent to kill participated as a co-conspirator with or aided and abetted *an actor* in commission of the murder in the first degree in order to find the special circumstance to be true. On the other hand, if you find beyond a reasonable doubt that the defendant was the actual killer, you need not find that the defendant intended to kill a human being in order to find the special circumstance to be true." (Italics added.)

The jury found Danielson guilty of first degree murder (and also Gary, a codefendant) and found the special circumstance allegations to be true. Danielson was sentenced to life without the possibility of parole. This court affirmed his conviction in an unpublished opinion filed on October 31, 2000.

The prosecution opposed Danielson's 2019 petition for resentencing, including on the ground that Danielson did not make a prima facie showing that he qualified for sentencing relief.

The trial court reviewed Danielson's record of conviction, held a hearing, and heard argument regarding Danielson's petition. Although it concluded that the 1998 jury instructions permitted the jury to convict Danielson on a natural and probable consequence theory, it denied Danielson's petition without issuing an order to show cause for lack of a prima facie showing that he could not have been convicted of first degree murder under present law. In the court's view, "the jury specifically found that [Danielson] was either the actual killer or a co-conspirator or aider and

4

abettor with the intent to kill in the commission of murder."[5]   Thus, the court concluded, "it looks like the jury in their findings found a specific path that would substantiate a first degree murder conviction [under current law] still."

Danielson filed a timely notice of appeal.

## II. DISCUSSION

Danielson argues the trial court erred in not issuing an order to show cause because he was not ineligible as a matter of law from relief under what is now section 1172.6.[6]   He contends that, contrary to the trial court's finding, his record of conviction does not show he was either the actual killer or acted with the intent to kill as a coconspirator or aider and abettor of the actual killer.   The essence of his argument is this:   although the jury found Danielson, acting with the intent to kill, assisted an "actor" in the murder of Dr. Holman, the jury could have done so by relying on Nielson's testimony that Danielson merely went about the Holman residence collecting items in a pillowcase while Nielson stabbed Dr. Holman with aid from Gary, and concluded that Danielson assisted Gary only, who was merely an "actor" in the murder of Dr. Holman.   Thus, the record off conviction does not conclusively establish the jury found, as is required under the relevant part of present first degree murder law, section 189, subdivision (e)(2), that

---

[5] The court also found Danielson did not make a prima facie case because he was a major participant in the underlying robbery and acted with reckless indifference to human life.   The parties agree that the court should not have denied Danielson's request for an order to show cause based on this finding.   In light of our conclusion that the court correctly concluded the jury found that Danielson at the very least aided and abetted the actual killer of Dr. Holman, we have no need and do not further discuss the merits of this additional finding.

[6] As the parties do in their appellate briefs, we will discuss the present law under the renumbered Penal Code provision, section 1172.6.

5

Danielson assisted Dr. Holman's "actual killer," who was Nielson. On that basis, Danielson claims he made a prima facie showing he could not be convicted of first degree murder under present law.

A. *Relevant Law*

Danielson was convicted of first degree murder committed in the perpetration of a robbery and burglary at a time when it was unnecessary to show under those circumstances that he personally acted with malice or assisted the actual killer in the murder. (See, e.g., *People v. Powell* (2018) 5 Cal.5th 921, 942 [" ' "The felony-murder rule makes killing while committing certain felonies murder without the necessity of further examining the defendant's mental state." . . . "[W]hen the defendant or an accomplice kills someone during the commission . . . of an inherently dangerous felony, the defendant is liable . . ." ' "].) This changed with the adoption of Senate Bill No. 1437 in 2018. It " 'amend[ed] the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life.' " (*People v. Gentile* (2020) 10 Cal.5th 830, 842 (*Gentile*), quoting Stats. 2018, ch. 1015, § 1, subd. (f), abrogated in other part by statute as stated in *People v. Birdsall* (2022) 77 Cal.App.5th 859, 866, fn. 19.) In other words, "[m]alice shall not be imputed to a person based solely on his or her participation in a crime." (Stats 2018, ch. 1015, § 2; § 188, subd. (a)(3).)

To further that change in the law, Senate Bill No. 1437 added multiple provisions to the Penal Code. (*Gentile*, *supra*, 10 Cal.5th at p. 842.) Putting aside the "major participant" provisions as not relevant to our resolution of this appeal, these additions include limiting liability under the felony-murder

rule "principally to 'actual killer[s]' (Pen. Code, § 189, subd. (e)(1) and those who, 'with the intent to kill,' aid or abet 'the actual killer in the commission of murder in the first degree' (*id*., subd. (e)(2))." (*People v. Strong* (2022) 13 Cal.5th 698, 708 (*Strong*).)

Also included among these added provisions is a process for those convicted of felony murder to seek relief, now contained in section 1172.6. This process "begins with the filing of a petition containing a declaration that all requirements for eligibility are met." (*Strong*, *supra*, 13 Cal.5th at p. 708, citing § 1172.6, subd. (b)(1)(A).) These requirements include that the information filed against the petitioner "allowed the prosecution to proceed under a theory of felony murder, murder under the natural and probable consequences doctrine or other theory under which malice is imputed to a person based solely on that person's participation in a crime," and that the petitioner "could not presently be convicted of murder" because of changes to sections 188 and 189 made by Senate Bill No. 1437. (§ 1172.6, subd. (a)(1), (3).)

If a petition is facially sufficient, the court must hold a hearing and determine if the petition makes "a prima facie case for relief." (§ 1172.6, subd. (c).) "If the petition and record in the case establish conclusively that the defendant is ineligible for relief, the trial court may dismiss the petition. [Citations.] If, instead, the defendant has made a prima facie showing of entitlement to relief, 'the court shall issue an order to show cause.' " (*Strong*, *supra*, 13 Cal.5th at p. 708, quoting § 1172.6, subd. (c).) The court shall then conduct an evidentiary hearing to determine whether to vacate the murder conviction, recall the sentence, and resentence the petitioner. (§ 1172.6, subd. (d)(1).)

In assessing whether a petitioner has made a prima facie showing, a court " 'can and should make use of the record of conviction' " (*People v. Lewis* (2021) 11 Cal.5th 952, 971 (*Lewis*)), which may include a review of testimony (*People v. Patton* (2023) 89 Cal.App.5th 649, 658), jury instructions, and verdict forms (*People v. Harden* (2022) 81 Cal.App.5th 45, 50). "This is consistent with the statute's overall purpose:  to ensure that murder culpability is commensurate with a person's actions, while also ensuring that clearly meritless petitions can be efficiently addressed as part of a single-step prima facie review process."  (*Lewis*, at p. 971.)

A court's prima facie inquiry is limited.  The court takes the petition's factual allegations as true and preliminarily assesses whether, if they all were proven, they would entitle the petitioner to relief.  (*Lewis*, *supra*, 11 Cal.5th at p. 971.)  " 'However, if the record, including the court's own documents, "contain[s] facts refuting the allegations made in the petition," then "the court is justified in making a credibility determination adverse to the petitioner." ' "  (*Ibid*.)

We review de novo a trial court's denial of a resentencing petition for failure to make a prima facie showing to determine whether the petitioner is ineligible for relief as a matter of law.  (*People v. Lopez* (2022) 78 Cal.App.5th 1, 14.)

The principal evidence presented at Danielson's 1998 trial relevant to the jury's finding that he, with the intent to kill, assisted an "actor" in Dr. Holman's murder was the testimony of Mrs. Holman and Nielson, the only eyewitnesses to the relevant events that occurred prior to and during the incident in the Holman residence.  We now review their testimony.

B. *Mrs. Holman's Testimony*

Mrs. Holman testified that around 8:00 on the night of March 30, 1990, she and Dr. Holman were watching television in their family room when the front doorbell rang. She went to the front door, opened it, and found three men standing there. The man in front, whom she later identified to police as Nielson, asked if Dr. Holman was home. She told Dr. Holman someone was at the door for him and went into the kitchen to clean the dinner dishes.

While cleaning the dishes, Mrs. Holman saw Dr. Holman and the three men standing in front of a desk area that was in the hallway by the entrance to the kitchen. One of the men asked Dr. Holman if he could use the telephone to call his wife. Very shortly after that, Mrs. Holman saw Nielson and Dr. Holman standing face to face in front of the kitchen refrigerator, blood on Dr. Holman's stomach, and Nielson stabbing Dr. Holman with a knife. After taking money from Dr. Holman's wallet, Nielson pushed him over the stove and kept stabbing him as he went to the floor.

Mrs. Holman asked Nielson to stop but he kicked Dr. Holman and kept stabbing him. After threatening her and taking her rings, Nielson forced Mrs. Holman into a hallway between the kitchen and the living room, where she found herself on her knees. Mrs. Holman heard Nielson continue to stab Dr. Holman. Nielson went back and forth between Dr. Holman and Mrs. Holman several times, coming over to Mrs. Holman, wiping off his knife blade with a cloth, and saying he had to go back to Dr. Holman to "finish him off." Nielson also told Mrs. Holman he was an ex-prison inmate named Juan Chavez, and he was paying Dr. Holman back for what he had done to someone in prison.

Mrs. Holman tried to get up from her knees a couple of times. A second man, whom she later identified to police as Danielson, came from the dining

9

room area, knocked her down, and told her to stay there. At Nielson's instruction, Danielson pulled her to the desk area and tied her hands behind her back with telephone wires he had ripped out, as Nielson "kept coming back wiping the blade off in front of me . . . , told me he was going to kill me and . . . kept saying [he had] to finish [Dr. Holman] off . . . ." One of the men kicked her down as she attempted to get up to push an alarm button. Nielson asked her for money, she said she did not have any, and Nielson went back and stabbed Dr. Holman some more.

Mrs. Holman recalled that, next, Nielson came back "and the next thing I know the blade was—evidently in wiping it had come loose, something happened, and he called the other two to help him look for the blade." She saw the third man come from a bedroom holding one of her pillowcases, which appeared to have items in it. All three men looked for the blade, and one of them found it. Other than possibly during that search, Nielson was the only one who handled the knife.

At Nielson's instruction, Danielson tied her feet to her hands and pushed her into the dining room area. Two of the men were by the desk and "started on a run and one of them kicked me in the head full force and then they left."

C. *Nielson's Testimony*

Nielson testified that he had entered into a plea agreement regarding Dr. Holman's murder, pursuant to which he pleaded guilty and agreed to cooperate fully with the prosecution and testify truthfully at the trial, in which case the prosecution would seek a life sentence without the possibility of parole against him and not the death penalty. He said he met Gary in 1985 or 1986 and thereafter interacted with him, mostly about drugs. He became acquainted with Danielson in 1989 or 1990. About a week before the

10

three went to the Holman residence, Nielson met with Danielson and Gary. Gary told Danielson that Nielson "probably would be good at helping him with his plan" to rob Dr. Holman, who Danielson understood kept a large amount of cash at his residence. It was said that, "if it was done, that since the doctor would recognize [Danielson], that he would have to die." Danielson said Mrs. Holman also would have to die upon witnessing what they had done. Nielson argued that Mrs. Holman did not have to die because she had never met any of them, and the men agreed to tie her up and not kill her. The three continued to talk about the plan throughout the week.

Nielson, Danielson, and Gary went to the Holman residence one evening at the end of March. Mrs. Holman answered the door and Danielson asked for the doctor and to use the phone. The three were allowed into the house and went to a desk in the kitchen area. Nielson then attacked Dr. Holman, stabbing him around his stomach. Gary restrained Mrs. Holman on the ground and Danielson went to the back of the house to loot it. Nielson stabbed Dr. Holman, cut his throat, and took money from his wallet. He then gave his knife to Gary, who stabbed Dr. Holman three or four times.

Nielson also took Mrs. Holman's rings. In order to throw the police a "curve ball," he told her he was Juan Chavez and paying back Dr. Holman for his prison conduct, having learned from Danielson that Dr. Holman had been in prison.

Danielson went to the bedroom area because, he told Nielson, he had previously washed the windows at the residence and seen cash there. He came down from the bedroom area and started heading out the door. Nielson told Danielson to come back because Nielson had lost the knife in the kitchen somewhere near Dr. Holman's body. He told Danielson and Gary to look for it, which Danielson did, and one of them found it. Nielson then heard

11

Danielson stab Dr. Holman multiple times. Gary hog-tied Barbara in the kitchen area with Danielson's help, using telephone cord from the kitchen, and the three left, Danielson kicking Mrs. Holman on the way out.

Subsequently, the jury found, among other things, that the special allegations made under section 190.2 were true, thereby finding that Danielson, acting with the intent to kill, assisted an "actor" in the first degree murder of Dr. Holman.

D. *Analysis*

It is readily apparent from our review of the 1998 trial record that the jury, in determining that Danielson had, with an intent to kill, assisted an "actor" in the murder of Dr. Holman, relied on all or some of Mrs. Holman's or Nielson's testimony. This testimony indicated at the very least that Danielson, acting with the intent to kill, conspired with or assisted Nielson in the first degree murder of Dr. Holman. If the jury found Mrs. Holman more credible, it relied on all or some of her testimony that Danielson directly assisted Nielson in killing Dr. Holman by knocking Mrs. Holman down and telling her to stay down as Nielson repeatedly stabbed Dr. Holman nearby; dragging Mrs. Holman to the desk area and tying her up at Nielson's instruction, as Nielson went repeatedly back and forth between stabbing Dr. Holman and wiping off his knife in front of Mrs. Holman; tying Mrs. Holman's hands behind her back and then tying her hands to her feet, also at Nielson's direction; and, again at Nielson's direction, looking for some part or all of the knife blade Nielson used to stab Dr. Holman when he lost it while doing so.

If the jury found Nielson more credible, it relied on some or all of his testimony that Danielson conspired with Nielson and Gary beforehand to go to the Holman residence in order to rob and kill Dr. Holman; that Danielson

12

asked Dr. Holman to use his phone in order to gain entry into the Holman residence so that they could rob and kill him; that Danielson, at Nielson's instruction, looked for the knife Nielson used to stab Dr. Holman when Nielson lost it while doing so; and that Danielson stabbed Dr. Holman multiple times.

Just as importantly, nothing in Mrs. Holman's or Nielson's testimony, and nothing identified by Danielson in his appellate papers, supports the conclusion that Danielson, acting with the intent to kill, assisted *only* Gary as an "actor" in the first degree murder of Dr. Holman. Danielson argues the jury could have relied on Nielson's testimony rather than Mrs. Holman's, and that Nielson's testimony indicates that Gary alone aided Nielson while Danielson went to another part of the house to loot it, from which the jury could have concluded that Danielson aided Gary but not Nielson. Nothing in Nielson's testimony supports this conclusion.

According to Danielson's opening brief, "under Nielson's version of events, it was Gary Danielson who aided Nielson, while David was in the back of the house." That is an inaccurate description of the record. Nielson's testimony on the roles all three men had in the killing of Dr. Holman is unambiguous. He testified that when he "lost the knife" while stabbing Dr. Holman, he summoned both Gary and Danielson to help him find it; they all looked for the knife together; they retrieved it ("somebody found it"); and after that, "David [Danielson] stabbed the doctor." Gary, too, "stabbed the doctor." So all three men, in Nielson's version of events, were not only present at the location of the stabbing, but participated in it. He further testified that the participation of each of the three in the stabbing was in accord with their agreement in advance that "we would all be culpable for the crime if we all stabbed the doctor."

13

Whether the jury relied on Mrs. Holman's version of events, or Nielson's version of events, or both versions, no reasonable jury could have found on this record that Danielson merely carried out or aided a robbery and burglary while the other two committed a murder. In fact, the whole premise of Danielson's proposed interpretation of the record limiting his role to aiding in the looting—that the robbery murder of Dr. Holman was "Gary's idea," not his, which is what the opening brief claims—has no support in the record. Uncontradicted testimony from Nielson is to the contrary. The only testimony addressing how the plan to murder Dr. Holman was hatched came from Nielson, and according to him, not only did Danielson come up with the plan (since Danielson knew that Dr. Holman kept a large quantity of cash at his residence), but Danielson suggested murdering *both* Dr. and Mrs. Holman in order to carry out the plan without getting caught, while Nielson objected to killing both, so they ended up with a plan to kill only Doctor Holman and tie up Mrs. Holman. Danielson's attempt to minimize his role is definitively contradicted by the trial record.

The jury's special circumstances verdicts, by finding true that Danielson acted with the intent to kill, indicates it must have relied on Nielson's testimony about a plan to commit a robbery murder—a plan not only suggested by Danielson, but carried out with his active participation in both the robbery and the murder. No jury that made this finding could have believed Danielson's role was limited to the robbery and burglary. Accordingly, we agree with the trial court's reading of the trial record. Danielson's record of conviction conclusively establishes that the jury found he was either a coconspirator in Dr. Holman's murder or directly assisted Nielson, the "actual killer," in killing Dr. Holman, while also participating in a burglary and robbery. We think the evidence is irrefutable that he would

14

have been convicted of first degree murder under current law, *at the very least* as a coconspirator or direct aider and abettor of the actual killer, and possibly as an actual killer himself given the testimony that he stabbed Dr. Holman. Danielson failed to make a prima facie showing otherwise.

In light of our conclusion, we need not and do not address the parties' other contentions. This includes their debate over the significance and correctness of *People v. Ervin* (2021) 72 Cal.App.5th 90, in which the appellate court distinguished between the pre-Senate Bill no. 1437 language in CALJIC 8.80 that allowed the robbery and burglary special circumstance allegations to be found true if a defendant, acting with the intent to kill, assisted an "actor" in the commission of murder in the first degree and the language now contained in section 189 that a defendant is criminally liable for murder in the first degree if, among other things, he or she assists the "actual killer" in the commission of murder in the first degree.

### III. DISPOSITION

The order appealed from is affirmed.

STREETER, J.

WE CONCUR:

BROWN, P. J.
FINEMAN, J.*

---

*Judge of the Superior Court of California, County of San Mateo, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

15